697 P.2d 658

UNITED STATES of America,
Petitioner,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, Hon. Stanley Z. Goodfarb, a judge thereof; Arizona Department of Water Resources, and Wesley E. Steiner, a director thereof; and Numerous Claimants To the Waters of the Gila River System and Source, Real Parties in Interest, Respondents.

The SAN CARLOS APACHE TRIBE
and the Tonto Apache Tribe,
Petitioners,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, Hon. Stanley Z. Goodfarb, Judge, Maricopa County Superior Court; and Arizona Department of Water Resources; Salt River Valley Water Users Association; Phelps Dodge Corporation, and all other claimants to water rights in the Gila River System and Source as Real Parties in Interest, Respondents.

Nos. 17623–SA, 17681–SA.

Supreme Court of Arizona,
En Banc.

Jan. 30, 1985.

Reconsideration Denied April 23, 1985.

Dirk D. Snel, Washington, D.C., for petitioner United States.

Sparks & Siler, P.C. by Joe P. Sparks, E. Dennis Siler, Kevin T. Tehan, Scottsdale, for petitioners San Carlos Apache Tribe, Tonto Apache Tribe.

Evans, Kitchel & Jenckes by Alvin H. Shrago, Phoenix, for respondent Phelps Dodge Corp.

John S. Schaper, Phoenix, for respondent Buckeye Irrigation Co.

Bill Stephens, P.C. by Bill Stephens, David A. Pennartz, Bradford T. Brown, Phoenix, for respondents Cities of Phoenix, Scottsdale, Mesa, Tempe, Glendale, Peoria, Chandler, Goodyear and Gilbert.

Lee, Theisen & Eagle by David W. Eagle, Phoenix, for respondent Smith.

Robert K. Corbin, Atty. Gen. by Russell A. Kolsrud, Jon K. Wactor, Phoenix, for respondent State of Arizona, Arizona State Land Department.

Jennings, Strouss & Salmon by M. Byron Lewis, John B. Weldon, Jr., Jon L. Kyl, Mikel L. Moore, Phoenix, for respondent Salt River Water Users Association.

Richardson & Mortensen by Irval L. Mortensen, Safford, for various respondents.

Navajo Nation Department of Justice by John A. MacKinnon, Window Rock, for amicus curiae Navajo Nation.

FELDMAN, Justice.

The United States, the San Carlos Apache tribe, and the Tonto Apache tribe (petitioners) bring these consolidated special action petitions challenging the jurisdiction of the courts of this state to adjudicate petitioners' claims to water rights in certain rivers. They attack, as well, the procedures adopted by the Arizona legislature for adjudication of such claims.

The petitions arise out of proceedings pending before the superior court of Maricopa County entitled: "In re the General Adjudication of All Rights to Use Water in the Gila River System and Source, Maricopa County W-1 though W-4 (Consolidated)." The proceeding is a consolidated ac-

F. Henry Habicht II, Asst. Atty. Gen. by Thomas H. Pacheco, Steven E. Carroll,

tion to adjudicate all rights to water within the watersheds of the Salt, Verde, Upper Gila, and San Pedro rivers.

Petitioners made appropriate motions for dismissal of the action on jurisdictional and constitutional grounds. The respondent trial judge denied these motions. Petitioners seek review through these special action proceedings.[1] In essence, petitioners claim that the respondent trial judge is proceeding with the action in excess of or without jurisdiction, so that special action relief is appropriate. Rule 3(b), Ariz.R.P. Sp.Act., 17A A.R.S.

### SPECIAL ACTION RELIEF

■ We note, at the outset, that relief by way of special action is not available where there is an adequate remedy by appeal. Rule 1(a), *id.* Arizona procedure does not, however, provide for appeal of interlocutory or intermediate orders. *See* 4 Am. Jur.2d, Appeal and Error, § 50 n. 17. For these reasons and because relief by special action is largely discretionary, we follow a general policy of declining jurisdiction when relief by special action is sought to obtain review of orders denying motions to dismiss or for summary judgment. We have no inclination to provide a special method of interlocutory appeal from such orders through grant of special action petitions, and we lack the capacity to handle the response that such an invitation undoubtedly would engender. In our view, appeal after judgment usually is an adequate remedy if the trial court has erred on the law in denying motions to dismiss or for summary judgment.

■ This case is the exception that proves the general rule. We deal here with questions of adjudication and quantification of water rights—one of the most important issues conceivable in an arid state such as Arizona. The questions presented are pure issues of law which can be decided as well at this stage of the case as after the evidence has been taken. The case has been

pending more than ten years and may well take another twenty for decision. Approximately 80,000 claimants have been served in this and other cases brought under the same statute; the other cases are currently pending in our trial courts. In cases of this magnitude, the interests of all parties and of the public demand that serious questions of law pertaining to both jurisdiction and constitutionality of the procedure adopted by the legislature be decided by this court and settled at the earliest possible moment. We therefore accept jurisdiction of the petitions for special action and proceed to consider the issues raised in the petitions.

### FACTS

1. *The Parties*

Both the San Carlos and Tonto Apache tribes are tribes of Indians organized pursuant to § 16 of the Indian Reorganization Act of 1934. 25 U.S.C.A. § 476 (1983). While the Tonto tribe is quite small, the San Carlos tribe is composed of approximately 8,000 members occupying a reservation of over two million acres in east central Arizona. Both tribes claim water from the Gila River watershed, including claims to the main stream of the river and some of its tributaries, such as the San Carlos, Black, Salt, San Simon, San Francisco, and Verde rivers, together with various creeks and other streams. The United States has claims to water rights in the Gila River watershed by reason of its status both as an owner of land within the watershed and as a trustee for Indian water rights. The respondent real parties in interest also claim various rights to the use of water within the watershed. Since much of Arizona is arid desert land without sufficient water to meet all demands, the claims of the petitioners and of the real parties in interest inevitably conflict.

2. *Historical Background*

Neither the issues presented nor the conflict between the parties can be understood

---

1. Under Arizona procedure, relief by "special action" encompasses the relief previously obtained through use of writs of certiorari, mandamus, or prohibition. Rule 1, Ariz.R.P.Sp.Act., 17A A.R.S.

or decided without some appreciation of the historical background and the present crisis. We take note that the current state of our water supply is critical. Water usage in Arizona exceeds available surface supply by three-fold in average years and by more in dry years, with the shortfall made up by pumping groundwater. We also take notice of the depletion of the available groundwater supply. Concern about the threat posed by this depletion led our legislature to adopt a comprehensive groundwater management law that gradually constricts groundwater withdrawals. *See* A.R.S. §§ 45–401 to 45–637. Since the amount of surface water available is insufficient to satisfy all needs, and since Arizona follows the doctrine of prior appropriation (*Bristor v. Cheatham,* 75 Ariz. 227, 255 P.2d 173 (1953)), it is unavoidable that the priority claims of large users will reduce, if not eliminate, the amount of water available to some of those with lower priority.

In the scheme of priorities, the claims of the federal government (based on its vast holdings of national forests, military reservations, and recreational areas) and of the Indians rank high. While the amount of water actually used by these entities may have been negligible until recent times, the magnitude of the right to use water on these lands has been far from negligible. In *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), the Supreme Court recognized that Indian reservations and their inhabitants had an implied right to the amount of water reasonably necessary to fulfill the purposes for which the reservation was created. As a result of the recognition of these *Winters* rights in desert areas such as Arizona, the federal government's water claims, including its claims as trustee for the Indians, "inescapably vie with other public and private claims for the limited quantities to be found in the rivers and streams." *United States v. New Mexico,* 438 U.S. 696, 699, 98 S.Ct. 3012, 3013, 57 L.Ed.2d 1052 (1978). Where the water from a particular river or watershed has been fully appropriated, the federal rights necessitate a "gallon-for-gal-

lon reduction in the amount of water available for water-needy state and private appropriators." *Id.* at 705, 98 S.Ct. at 3016.

The problem, therefore, is clear. Since there is not enough water to meet everyone's demands, a determination of priorities and a quantification of the water rights accompanying those priorities must be made. Obviously, such a task can be accomplished only in a single proceeding in which all substantial claimants are before the court so that all claims may be examined, priorities determined, and allocations made. This procedure cannot be undertaken if federal water claims, especially those of the Indians, must be excluded from the proceeding. In the past, however, such exclusion was unavoidable for two reasons. First, the United States and the Indian tribes were entitled to the benefit of the doctrine of sovereign immunity and could not be joined as parties without their consent. Second, most of the states of the desert West were formed and admitted to the union pursuant to congressional enabling acts which were construed to prohibit the state and its courts from asserting claims over Indian property or reservations. An additional impediment exists because many states were required by enabling acts to include disclaimer provisions in their state constitutions. States with such constitutional provisions are referred to as "disclaimer states." One such state was Arizona, which adopted a disclaimer as article 20, ¶ 4 of the Arizona Constitution. It is that provision which brings us the present controversy.

### 3. *The Controversy*

In 1974 Salt River Valley Water Users Association (SRV) invoked the general stream adjudication provisions of A.R.S. §§ 45–231 to 45–245 (now repealed and superseded by A.R.S. §§ 45–251 to 45–260) by filing a petition to determine conflicting water rights. SRV filed the petition with the State Land Department, the appropriate agency under the former statute. The proceeding was entitled "In the Matter of the Determination of Conflicting Rights to

the Use of Water from the Salt River Above Granite Reef Dam and Its Tributaries...." In 1979 the Department advised various claimants of the pending petition and required that claims be filed pursuant to A.R.S. § 45–232. Petitioners were among the claimants so notified. Later that year several Indian tribes, including the petitioners, filed actions in the United States District Court for the District of Arizona, seeking a declaration of rights with respect to the issues raised in the proceeding before the Arizona State Land Department. Within two months after that filing, the state legislature repealed the former act (§§ 45–231 to 45–245) and replaced it with the present statute (article 6, title 45, Arizona Revised Statutes, consisting of §§ 45–251 to 45–260 and entitled "General Adjudication of Water Rights").

Although the new statutes did not provide expressly for transfer of pending actions, they did contemplate such transfer. *See* A.R.S. § 45–259. The proceeding brought by SRV and still pending before the State Land Department was transferred to the Superior Court of Maricopa County. Petitions for a general adjudication of rights in the Salt, Verde, and San Pedro rivers were also filed pursuant to § 45–252 of the new statute. The clerk of the superior court notified this court of such filings; we consolidated the general adjudication proceedings and assigned them to the respondent trial judge, the Honorable Stanley Z. Goodfarb.

Meanwhile, various Indian tribes made other federal court filings asserting a lack of jurisdiction in state court. The contentions of the tribes and the United States received unfavorable rulings from the United States District Court. The Ninth Circuit Court of Appeals reversed the district court judgments. *San Carlos Apache Tribe v. State of Arizona*, 668 F.2d 1093 (9th Cir.1982); *Navajo Nation v. United States*, 668 F.2d 1100 (1982); *see also Northern Cheyenne Tribe v. Adsit*, 668 F.2d 1080 (9th Cir.1982). The final word on these cases came from the United States Supreme Court in *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S.Ct. 3201,

77 L.Ed.2d 837 (1983). That decision approved the rulings of the district court and eventually resulted in remand of the cases from district court to the state court in which the litigation had commenced. Following that remand, petitioners and others renewed their motions to dismiss on jurisdictional and constitutional grounds. After all such motions were denied by Judge Goodfarb, petitioners filed the instant special action proceedings.

Although the long trail which has brought us to this point has consumed several years, many issues which would otherwise afflict us have been disposed of during that time. So that we may focus upon the few true issues remaining, it is appropriate that we describe those which have so far been settled and which need no longer concern us. This can be done best by a short review of the legal history.

## LEGAL HISTORY

The seminal case concerning the nature and extent of Indian claims to water is *Winters v. United States*. In *Winters*, the Ninth Circuit Court of Appeals had noted that most of the land reserved to Indians was so barren and arid that it would be worthless without sufficient water for irrigation. *Winters v. United States*, 143 F. 740, 745 (9th Cir.1906). Therefore, the court held, a treaty by which the Indians ceded rights to their aboriginal land in return for a reservation must be construed as impliedly reserving water for the use and benefit of the Indians who would reside on the reservation. *Id.* at 749. Noting that the United States held title to reservation lands for the use and benefit of the Indians, the court held that the United States also held title, for the use and benefit of the Indians, to such water rights as would be necessary for irrigation of the reservation lands. *Id.* at 748. This doctrine was confirmed on a second hearing before the circuit court, 148 F. 684 (9th Cir.1907), and the decision was affirmed by the United States Supreme Court in *Winters v. United*

*States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 346 (1908).

The full extent of the *Winters* doctrine was clarified in *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). There, the United States Supreme Court held that the implied reservation announced in *Winters* was a reservation of sufficient water to irrigate all irrigable portions of the reservation. *Id.* at 600–01, 83 S.Ct. at 1498. Stating that the United States has power to reserve water rights for its own property and for its reservations, including Indian reservations, the Court noted that the United States had intended to deal fairly with the Indians by reserving for them those waters without which the land reservations were valueless. In the absence of an earlier physical appropriation, the reservation of sufficient water to irrigate all irrigable portions of the reservation would take effect, therefore, at the time at which the Indian reservations were created. *Id.* at 600, 83 S.Ct. at 1498.

Experience in the lower courts revealed that the *Winters* doctrine was easier to announce than to effectuate. Adjudication of the precise amount to which the Indians were entitled required joinder of the tribes or of the United States in its capacity as trustee for those water rights, but the doctrine of sovereign immunity presented an insuperable obstacle to such joinder. To overcome that problem, Congress enacted a provision known as the McCarran Amendment; it provided as follows:

(a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, ... where it appears that the United States is the owner of ... water rights by appropriation ..., by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty ...

43 U.S.C.A. § 666 (1964).

The reach of the McCarran Amendment was explained in a series of cases. The United States Supreme Court first held that the Act subjected all rights of the United States to general adjudication. *United States v. District Court for Eagle County*, 401 U.S. 520, 524, 91 S.Ct. 998, 1002, 28 L.Ed.2d 278 (1971). Because *Eagle County* involved federal forest land, some doubt remained as to whether the McCarran Amendment waiver of sovereign immunity encompassed claims involving water rights on Indian reservations. Any doubt on this score was settled by *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), in which the Court held that the Amendment applied to claims asserted by the United States to reserved water rights "held on behalf of Indians." *Id.* at 809–12, 96 S.Ct. at 1242–43. The intent of the Amendment, the Court held, was to waive sovereign immunity with respect to state court adjudication of water rights claimed by the United States for all lands to which the United States held title, including Indian reservations.

The next question raised was whether the McCarran Amendment applied to "disclaimer states" such as Arizona. The *Colorado River* Court did not address this question because Colorado is a "non-disclaimer" state; its enabling act did not require the state to disclaim any interest in Indian lands or the rights appurtenant thereto. This issue, too, has been laid to rest. In *Arizona v. San Carlos Apache Tribe of Arizona, supra,* the Supreme Court held that "vigorous debate" with respect to the meaning and significance of the Enabling Acts was irrelevant.

... because we are convinced that, whatever limitation the Enabling Acts or federal policy may have originally placed on state court jurisdiction over Indian water rights, those limitations were removed by the McCarran Amendment.... Moreover, we stated in *Colorado River* that

'bearing in mind the ubiquitous nature of Indian water rights in the Southwest, it is clear that a construction of the Amendment excluding those rights from its coverage would enervate the Amendment's objective.'

*Id.* at 564, 103 S.Ct. at 3212. To the argument that the McCarran Amendment waived the sovereign immunity of the United States but not of the Indian tribes, the Court responded as follows:

This argument, of course, suffers from the flaw that, although the McCarran Amendment did not waive the sovereign immunity of Indians as *parties* to state comprehensive water adjudications, it did ... waive sovereign immunity with regard to the Indian *rights* at issue in these proceedings. Moreover, contrary to the submissions by certain of the parties, any judgment against the United States, as Trustee for the Indians, would ordinarily be binding on the Indians. In addition, there is no indication in these cases that the state courts would deny the Indian parties leave to protect their interests. Thus, although the Indians have the right to refuse to intervene even if they believe that the United States is not adequately representing their interests, the practical value of that right in this context is dubious at best.

*Id.* at 566, n. 17, 103 S.Ct. at 3213, n. 17.

■ Thus, it is clear that the effect of the McCarran Amendment is to permit general adjudication of water rights in state courts by joining the United States as a party both in its capacity as the holder of water rights appurtenant to federal land and as trustee for those rights reserved for Indian lands. We conclude, therefore, that neither the doctrine of sovereign immunity nor the Arizona Enabling Act constitutes an impediment to a general state court adjudication of water rights to streams within the state of Arizona. The question not decided and expressly left open by the United States Supreme Court (*San Carlos,* 463 U.S. at 570, n. 20, 103 S.Ct. at 3215, n. 20) is whether any provision of the state

**2.** Emphasis supplied.

constitution created such an impediment by depriving the state judicial system of such jurisdiction. That, then, is the primary issue before us.

ARTICLE 20, ¶ 4—THE "DISCLAIMER"

Article 20, ¶ 4 of the Arizona Constitution provides as follows:

The people inhabiting this State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, ..., and that, until the title of such Indian or Indian tribes shall have been extinguished, the same shall be, and remain, subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.

This provision, of course, is a part of the Arizona Constitution because § 20 of the Enabling Act (36 Stat. 557, 568–579) required that such a provision be made "by ordinance irrevocable without the consent of the United States and the people of said state." Subsequent to *San Carlos,* the impediment of the Enabling Act no longer exists. Is our state constitutional provision an impediment?

1. *Precedent Interpreting the Words of Article 20, ¶ 4*

Petitioners argue that because the first phrase of article 20, ¶ 4 constitutes a disclaimer of title to Indian lands, the second phrase (providing that Indian land "shall be, and remain, subject to the disposition and *under the absolute jurisdiction and control* of the Congress")[2] must carry a different meaning. According to petitioners, the second phrase of article 20, ¶ 4 constitutes an acknowledgement that the courts of this state have neither jurisdiction nor control over Indian water rights. Thus, they urge, the attempt to proceed with a general adjudication of water rights is an act beyond the jurisdiction of the

respondent trial judge. In essence, this would mean that article 20, ¶ 4 cedes exclusive jurisdiction to the United States.

We do not agree with this contention. The Supreme Court has never construed the words in the Enabling Act—which are identical to those in the Arizona Constitution—to constitute an absolute cession of state jurisdiction and a recognition of exclusive jurisdiction and control in Congress. *San Carlos*, 463 U.S. at 562, 103 S.Ct. at 3211, citing *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896); *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). Thus, the reasoning of *San Carlos* militates against the construction sought by petitioners.

We find no case, and none has been cited, in which a constitutional provision similar to article 20, ¶ 4 has been construed, as urged by petitioners, to be a cession of state jurisdiction and acknowledgement of exclusive federal jurisdiction. In New Mexico, the supreme court has held that its constitutional disclaimer was not a bar to state court adjudication of Indian water rights. N.M. Const. art. 21, § 2; *State ex rel. Reynolds v. Lewis*, 88 N.M. 636, 545 P.2d 1014 (1976). The court stated that although New Mexico, by this provision, had "disclaim[ed] all right and title to Indian lands and submit[ted] to the jurisdiction and control of the United States," the state did not assert an interest in the Indian lands by proceeding with a general adjudication of water rights. 88 N.M. at 637, 545 P.2d at 1015. The court held, also, that the state could exercise power over the Indians if the federal government had specifically granted it; therefore, it declared the New Mexico constitutional provision inapplicable to the general adjudication procedure. *Id.* A similar result was reached in *Jicarilla Apache Tribe v. United States*, 601 F.2d 1116 (10th Cir.), *cert. denied*, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979). The argument presented here was urged in *Jicarilla*, and the Tenth Circuit held that the disclaimer clause did not prevent the state's exercise of control so long as it did not interfere with Indian self-government

or detract from the rights granted or reserved to the Indians by federal law. *Id.* at 1135. Thus, no law supports the position urged by petitioners. To the contrary, the cases just cited support the construction which respondents urge, that the second phrase of our constitutional provision is an acknowledgement of federal superiority in matters involving Indians and Indian land but not a complete abdication of state power in those situations where Congress has permitted the states to exercise jurisdiction.

Our own cases lead to a similar conclusion. In *Francisco v. State*, 113 Ariz. 427, 556 P.2d 1 (1976), we reviewed our previous cases, particularly *Porter v. Hall*, 34 Ariz. 308, 271 P. 411 (1928), and concluded that we have consistently construed the words in question as a disclaimer of "only the state's proprietary interest in Indian lands and not its governmental interest." *Id.* 113 Ariz. at 430, 556 P.2d at 4. Although this construction was directed to the words of the Enabling Act, it applies equally to the constitutional provision which contains the same wording. We indicated in *Francisco* that the word "absolute" means the "undiminished" and not the "exclusive" jurisdiction of the federal government. *Id. See also Warren Trading Post Co. v. Moore*, 95 Ariz. 110, 387 P.2d 809 (1963), *reversed on other grounds*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Williams v. Lee*, 83 Ariz. 241, 319 P.2d 998 (1958), *reversed on other grounds*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

2. *The Historical Context*

Thus, Petitioner's primary argument is unsupported by precedent. It is equally unsupported by history. The history of this state, and that of other "disclaimer states," neither supports nor demonstrates any recognition of state cession of jurisdiction over Indian lands or those that reside therein. Quite to the contrary, our history contains an almost uninterrupted sequence of attempts by the legislative and executive branches of state government to assert state governmental power over and in Indi-

an lands.[3] While many of these attempts have been unsuccessful because they have conflicted with superior federal authority or policy and thus have been held invalid, these examples show that the state has steadfastly maintained that it has the power to exercise governmental authority in, on, and over Indian land, provided that it makes no proprietary claim to such land and subject, always, to the superiority of federal authority. Nothing in our history, therefore, indicates a recognition that any part of article 20, ¶ 4 constitutes a cession of all state governmental power and a recognition of exclusive federal governmental power in Indian country.

Petitioners argue, however, that the wording of Public Law 280, § 6 (67 Stat. 590) establishes Congress' historical interpretation that the Enabling Act language copied in the various state disclaimer provisions was intended as a reservation of exclusive jurisdiction in the federal government. Public Law 280 provides as follows:

> Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this subchapter. . . .

25 U.S.C.A. § 1324 (1983).

 We do not view the quoted language as mandating a conclusion that Congress intended the enabling acts to reserve exclusive federal jurisdiction over Indian country. There is no specific legislative history to indicate the congressional intent with respect to the language contained in the enabling acts. The legislative record on this point has been described as "sparse." *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering,* — U.S. —, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1984). In fact, the Supreme Court has noted that the existence of the disclaimer provisions in various state constitutions has "more to do with historical timing than with deliberate congressional selection." *San Carlos,* 463 U.S. at 562, 103 S.Ct. at 3211.

 More importantly, we do not believe that constitutional provisions may be interpreted as if they were simple contracts. Fine semantic or grammatical dis-

---

**3.** *Central Machinery Co. v. Arizona State Tax Commission,* 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980) (attempted imposition of state "transaction privilege tax" on a Gila River Reservation tribal enterprise); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (attempted imposition of motor carrier license and fuel use taxes on a non-Indian logging company doing business on Fort Apache Reservation); *McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (attempted taxation of reservation Navajo Indian's income); *Warren Trading Post Co. v. Arizona State Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (attempted taxation of sales of non-Indian business on Navajo Reservation); *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (attempted exercise of civil jurisdiction over suit brought by a non-Indian against an Indian on Navajo Reservation); *Williams v. United States,* 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946) (state jurisdiction over crimes between non-Indians, but not between Indians, committed on Indian reservations); *Begay v. Kerr-McGee Corp.,* 682 F.2d 1311 (9th Cir.1982) (Arizona workers' compensation law applicable to Indian workers at non-Indian uranium mine on Navajo Reservation); *United States v. Porter,* 22 F.2d 365 (9th Cir.1927) (state authority to tax Navajos for property owned by them and located outside the reservation); *Francisco v. State,* 113 Ariz. 427, 556 P.2d 1 (1976) (attempted assertion of personal jurisdiction over Indian on Papago Reservation); *Application of Denetclaw,* 83 Ariz. 299, 320 P.2d 697 (1958) (attempted assertion of jurisdiction over Indian for alleged violations of state traffic code committed on Navajo Reservation); *Porter v. Hall,* 34 Ariz. 308, 271 P. 411 (1928) (Indian reservations are "within the political and governmental, as well as geographical boundaries of the state" and Indians are therefore state residents); *Nenna v. Moreno,* 132 Ariz. 565, 647 P.2d 1163 (App.1982) (attempted enforcement of child support order against Indian residing on Papago Reservation); *Wauneka v. Campbell,* 22 Ariz.App. 287, 526 P.2d 1085 (1974) (tribal code provision requiring Navajo Reservation Indians operating motor vehicles to hold a valid state driver's license did not constitute consent to enforcement on the reservation of all of Arizona's traffic laws).

tinctions, legalistic doctrine, and parsing of sentences may lead us to results quite different from the objectives which the framers intended to accomplish. Constitutions, meant to endure, must be interpreted with an eye to syntax, history, initial principle, and extension of fundamental purpose. *State v. Robertson,* 293 Or. 402, 434, 649 P.2d 569, 588 (1982); *see also Arizona Newspapers Association v. Superior Court,* 143 Ariz. 560, 694 P.2d 1174 (1985). To adopt a "strict" interpretation of the words, based upon an assumed congressional intent as to the meaning of the same language in the Enabling Act, might fit well with the rules governing interpretation of commercial contracts, but would lead to a result directly contrary to the objectives sought by Congress. If one thing is clear on this issue, it is that the Enabling Act and the provisions which it required to be inserted in the state constitution were intended to ensure supremacy of federal policy and federal law with regard to Indian land. The federal policy, asserted in the McCarran Amendment, is that the United States is ". . . to represent, as guardian, . . . the Indian tribes in any state court general water rights adjudication proceeding. . . ." *Jicarilla, supra,* 601 F.2d at 1130. There is no clear necessity to read the disclaimer provisions of article 20, ¶ 4 of the state constitution as a cession of exclusive jurisdiction. We prefer, if possible, the interpretation which best serves the purposes and objectives of federal law and federal policy, which we acknowledge as supreme in this area. One of those objectives is that Indian claims to surface waters ordinarily be adjudicated in state court as part of a general water rights adjudication, with the United States representing Indian interests. *San Carlos,* 463 U.S. at 564, 103 S.Ct. at 3212. Unless compelled by unambiguous language, we refuse to interpret the provisions of the Arizona Constitution so restrictively as to defeat federal policy when supremacy of that policy was the very objective Congress sought to accomplish by requiring article 20, ¶ 4 to be part of the organic law of this state.

### 3. *Interpretation of the Disclaimer*

Article 20, ¶ 4 may be given full meaning by construing it, first, as a disclaimer of all rights to "Indian lands considered as property," *Porter v. Hall,* 34 Ariz. at 321, 271 P. at 415, and, second, as an acknowledgement that federal law and policy are paramount on Indian reservations. Reservation lands "are within the political and governmental, as well as geographical boundaries of the state." *Id.* They are not immune from the reach of state governmental authority. Thus, by the first clause of article 20, ¶ 4, the state waives any claim of right, title, or interest to Indian lands as property. By the second portion of ¶ 4, the state acknowledges Congress' superior right of disposition, jurisdiction, and control, but does not cede exclusive jurisdiction. Indian reservations remain politically and governmentally part of the state, and state law applies on the reservations, as does state process and procedure, so long as its application is consistent with the will of Congress. The basic test is set forth in *Williams v. Lee, supra.* State laws apply on reservations unless their application would impair rights granted, reserved, or protected by federal law or would interfere with tribal self-government. 358 U.S. at 219–20, 79 S.Ct. at 270–71.

Application of state adjudicatory procedures to water claims does not interfere with tribal self-government because the tribal court systems have no authority to adjudicate the claims of non-Indians residing off-reservation. Furthermore, no adjudication can be effective unless all claimants are before the court. No benefit will accrue to Indian claimants who vindicate their water rights in tribal court if an appropriator not subject to the writ of that court appropriates water allotted by the tribal court. Nor does adjudication by Arizona courts impair rights granted or reserved by federal law; as noted above (*ante* at 669), the McCarran Amendment expresses the intent of Congress that

such rights should be adjudicated in state court.

 Finally, petitioners argue that a general adjudication affects title to Indian property. We agree. Any application of state law or process affects that to which it is applied. However, as we interpret our constitution, it forbids the state to claim Indian land or property and to apply its law to Indians or Indian land in contravention of federal law or tribal rights. It does not prohibit more. The adjudication of conflicting water rights, including those of the tribes and individual reservation Indians, is not a claim to Indian title. Indian rights are conferred by federal law, and it is the federal substantive law which our courts must apply to measure those rights in the state adjudication. *San Carlos*, 463 U.S. at ——, 103 S.Ct. at 3216. Where state law conflicts, it must give way. Our courts have neither the intention nor the power to overturn the *Winters* doctrine or any other federal rule which supports the Indian claims. State court assumption of jurisdiction does, therefore, "affect" Indian land, but only to the extent that adjudication of any right affects that right. It is not a contest of the validity of the Indian claims nor of the law by which they are measured. Nor will state adjudication usurp federal disposition, jurisdiction, or control; the federal government seeks to exercise no right of disposition, jurisdiction, and control in this instance. It seeks rather to confer that right or obligation on the state.

 We hold, therefore, as a matter of state law, that article 20, ¶ 4 of the Arizona Constitution is not an impediment to a general adjudication of water rights in state court, even though as part of that proceeding there will be an adjudication of the claims of the tribes and of reservation Indians. By virtue of the McCarran Amendment, the state has jurisdiction over the United States as trustee of the Indian claims and has jurisdiction to adjudicate the subject matter of those claims. The Arizona Constitution does not prohibit it from so doing.

## OTHER CONSTITUTIONAL ISSUES

### 1. *The Treaty with the Apaches*

Petitioners argue that the state is forbidden to exercise jurisdiction because of certain provisions of the 1852 treaty between the United States and the Apache tribe. We acknowledge, of course, the supremacy of federal treaties. U.S. Const., article 6, clause 2. Article I of the treaty in question provides that the Apache Nation "shall be exclusively under the laws, jurisdiction and government of the United States of America." Treaty with the Apaches, July 1, 1852, 10 Stat. 979. We note, also, that while our constitutional provision uses the term "absolute," the treaty uses the term "exclusively." The latter term, of course, is less open to interpretation than is the term used in article 20, ¶ 4. *See Surplus Trading Co. v. Cook*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930); *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1984). However, our duty here is not to interpret the treaty with the Apaches but to interpret the constitution of the state of Arizona.

 The question of whether federal law, including treaties made by the federal government, prohibits the state of Arizona from exercising jurisdiction to make a general adjudication of water rights was settled for us by the United States Supreme Court in *San Carlos, supra*. The Court there held that the McCarran Amendment removed all impediments under federal law. 463 U.S. at 564, 103 S.Ct. at 3212. This, of course, should include treaties made by the President and ratified by Congress. Any impediment created by the provision of the treaty with the Apaches is a matter that should have been raised with the United States Supreme Court. We have neither the power nor the inclination to conclude that the Supreme Court erred in failing to consider the provisions of the Apache treaty when it decided *San Carlos*. We note in passing, however, that this issue, too, has been decided against petitioners in federal courts. *See Mescalero Apache Tribe v. O'Cheskey*, 625 F.2d 967,

971 (10th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1417, 67 L.Ed.2d 383 (1982).

2. *State Constitutional Provisions Regarding the Judicial Branch of Government*

■ Petitioners next argue that the provisions of A.R.S. § 45–251 to 45–260 are invalid under article 4, part 2, § 19 of the Arizona Constitution. This provision prohibits the legislature from enacting "local or special laws" which change rules of evidence, regulate the practice of the judicial system, limit civil actions, or grant special or exclusive privileges. The argument is premised on the fact that A.R.S. § 45–254 requires all water rights claimants to make a statement of their claim and bars all claims not in compliance with the statute. *See* A.R.S. § 45–254(A), (E). Petitioners contend that federal *Winters* rights claimants do not have access to some of the information required by the statute. A.R.S. § 45–254(C). Since it is not possible for them to comply with the statute, they urge that the statute is a "special law" which permits the filing of claims based on state law but not those based on rights granted by federal law. If petitioners' contention were correct, the statute would, of course, be invalid under federal law as well as state law. However, their contention is not correct. We must interpret the statute with common sense and, if possible, in a manner consistent with constitutional principle. Since federal law is supreme, it follows that claims based on rights granted by federal law, including the *Winters* doctrine, will be sufficient under the statute even though the information provided does not include that required to support claims based on state law. Also, see A.R.S. § 45–254(C), requiring only such information as is "appropriate."

■ Petitioners claim that the statutes violate article 6, § 5 of the Arizona Constitution by expanding the original jurisdiction of this court. We do not read the statute in that manner. Under A.R.S. § 45–252, the proceedings are filed in superior court. Under the same statute, this court assigns those adjudication proceedings to a judge of the superior court. The superior court has original jurisdiction. Ariz. Const. art. 6, § 14. In our view, the fact that the statute requires us to make the assignment does not give us original jurisdiction of the case. We sit as a reviewing court in the exercise of our appellate jurisdiction. *Id.* art. 6, § 5(3).

■ Nor do we believe that the provisions of the statute which pertain to the appointment of the master (A.R.S. § 45–255), the application of the rules of evidence (A.R.S. § 45–259), and the effect of prior judgments (A.R.S. § 45–257(B)(1)) infringe upon the powers of this court as conferred by article 6, § 5(5), which gives this court the power to make procedural rules. The grant of that power, including the power to make rules of evidence, does not prevent the legislature from enacting supplementary provisions. *See State ex rel. Collins v. Deason,* 142 Ariz. 587, 691 P.2d 678 (1984). Nor do we agree that these provisions of the statute violate article 3 of our constitution, pertaining to distribution of power. We held in *DeCamp v. Central Arizona Light & Power Co.,* 47 Ariz. 517, 57 P.2d 311 (1936), that article 3 was violated at a point where legislative enactments "unreasonably limit or hamper" the judicial system in performing its duties. Id. at 521, 57 P.2d at 313. We do not believe that the statutes in question reach that point. To the contrary, they make available to this court the resources and procedures which enable the judicial system to cope with the considerable task assigned to it. Without these resources, we would be faced with the necessity of closing the courthouse to other judicial business in order to handle the water adjudication.

3. *Due Process and the Arizona Procedure*

Petitioners claim that the role which the statutes give the Arizona Department of Water Resources (DWR) violates the procedural due process guarantees of the fourteenth amendment of the United States

Constitution and article 2, § 4 of Arizona's constitution. Petitioners argue that the DWR is "an institutional adversary of Indian reserved rights" and that by conferring adjudicatory power upon DWR and its director, the legislature created an inevitable conflict of interest which will violate fundamental fairness and thus transgress the constitutional due process guarantee.

The argument misconceives the functions of DWR and the nature of its involvement under the statutory scheme. Under the "General Adjudication of Water Rights Act" (A.R.S. §§ 45–251 to 45–260) enacted in 1979, the State Land Department has been eliminated from the adjudicatory process. Its sole involvement with the adjudicatory proceedings is that of a claimant to water rights on behalf of the state. The DWR, on the other hand, is not involved as a claimant and may not file petitions for adjudication. The separation of roles has been thorough. For instance, the attorney general of the state of Arizona represents the state with respect to claims asserted on the state's behalf, A.R.S. § 45–252(B), but the director of DWR is represented by separate legal counsel, independent from the state or its agencies. *Id.*

With this in mind, we turn now to the functions which DWR is assigned. Once a petition for adjudication is filed, DWR is required to assist the court in several different manners. First, it helps in determining the scope of the adjudication by making a recommendation with regard to the portions of the river system subject to the adjudication. A.R.S. § 45–253(A)(2). It helps develop the form to be used for the statement of claim. *Id.* It serves process on all potential claimants. *Id.* The act provides that if a master is appointed, this court may select that master from a list of persons submitted by the director of DWR. A.R.S. § 45–255(A). While DWR is required to make such recommendations, it is this court which selects the master. *Id.* Nor is this court limited to the director's recommendations; the statute does not require that the appointment be made from the names so recommended. *Id.*

The director's final and most important task with respect to the adjudication proceedings involves "technical assistance," as specified in A.R.S. § 45–256. The statute requires the court or master to request technical assistance from the director on subjects "with respect to which the director possesses hydrological or other expertise." *Id.,* subsection (A). When such aid has been requested, the director is required to identify hydrological boundaries and potential claimants, locate and obtain records, conduct a "general investigation" or examination of the river system and source, investigate and examine facts pertaining to claims, prepare maps and plats, gather such other information "as may be necessary or desirable," and report to the court or master. *Id.,* subsections (A), (B). The report required by A.R.S. § 45–256(B) is described as follows:

> The technical assistance rendered by the director shall be set forth in summary form on a claim by claim basis in a report prepared by the director and filed with the court or the master, which shall then be available for inspection by any claimant. Any claimant may file with the court or the master written objections to the report or any part of the report.... Those parts of the report with respect to which no written objections have been timely filed may be summarily admitted into evidence. Those parts of the report with respect to which written objections have been timely filed shall not be admitted into evidence until such time as each claimant who has filed written objections ... shall have had a fair and reasonable opportunity to contest the validity or admissibility of those parts of the report to which his objections were directed. Each claimant who has filed written objections ... shall also have a fair and reasonable opportunity to present evidence in support of or in opposition to those parts of the report to which his objections were directed, to present evidence in support of his claim and to make objections to any other claim.

■ Even if we were to assume that DWR, as a state agency, is so related to the state and other state agencies that it could not fairly serve in an adjudicatory role, we do not believe that the duties conferred upon the department by the new statute transgress the due process guarantee. Petitioners assume that the director will be recommending a decree to the court and that the making of such a recommendation is tantamount to participation in the adjudicatory proceedings. We do not read the statute so broadly. It does not require the director to make such a recommendation, nor, in our view, is such action by the director appropriate. We agree with the respondents that there is nothing in the statutory language that would permit or allow the department to make a report recommending a particular decree or to rank or quantify the competing claims. Ranking of claims and quantification of rights require considerable legal expertise and will be the function of the master, as to recommendations, and of the trial court, as to the final decree. The director's duties are confined to factual analysis and administrative aid.

We acknowledge, of course, that the examination of facts, the making of factual findings, and the resolution of factual disputes are all part of the adjudicatory process. If DWR were vested with such responsibility or authority, it might fairly be said that DWR was a participant in the adjudicatory process. Again, however, we do not read the statute so broadly. Under the statutory plan, DWR's report will be made after an investigation of facts and will contain factual analysis and, no doubt, factual determinations. The key point, however, is that such determinations have neither validity nor presumed validity if objected to. A.R.S. § 45–256(B) provides that the portions of the report to which no objection has been made "may be summarily admitted into evidence." However, the statute also provides that the portions of the report to which objection has been made shall not be admitted in evidence until the objectors "shall have had a fair and reasonable opportunity to contest the validity or admissibility of those parts of the report to which [the] objections were directed." Thus, the statute contemplates that the objections to contested portions of the report shall be heard and that each objector may present evidence to support his objections to every other claim and to support or reinforce his own claim. *See* A.R.S. § 45–256.

That evidence, we believe, is to be presented in hearings before the master. A.R.S. § 45–257 provides as follows:

A. The master shall:

1. ..., conduct such hearings and take such testimony as shall be necessary to determine the relative water rights of each claimant.

2. Prepare and file with the court a report in accordance with rule 53(g) of the Arizona rules of civil procedure, which shall contain findings of fact and conclusions of law.

Subsection B of the same statute charges the court with making the final determination of the relative rights of all claimants. In our view, therefore, DWR is to decide no contested fact or issue of law, nor any legal issue of any kind. This authority is conferred instead upon the master. The power to review the master's findings and conclusions and to make the final determination of "the extent and priority date of and [to] adjudicate any interest in or right to use the water of the river system" is vested in the court. A.R.S. § 45–257(B).

■ We are aware that due process requires that a party be given a "fair trial in a fair tribunal." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

... *Murchison* has not been understood to stand for the broad rule that the members of an administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications.... The accepted rule is to the contrary. [citing cases]

*Withrow v. Larkin*, 421 U.S. 35, 53–54, 95 S.Ct. 1456, 1467–68, 43 L.Ed.2d 712 (1975). We believe the Arizona procedure is well

within the limits permitted by *Murchison, supra,* and *Larkin, supra.* The administrative agency, even if it is adverse to or institutionally biased against petitioners, is not an adjudicator of fact or law. It is an investigator, a provider of expert and administrative assistance, and an identifier of issues. All of these roles fall far short of participation in the actual adjudicatory process—the resolution of contested issues of fact or law. We find no violation of due process.

■ Finally, petitioners argue that the Arizona adjudicatory procedure violates due process because it contains no provision which would permit the director, DWR, the master, or the judge to consider the federal legal basis and origin of the Indian water claims. We reject this argument. The statute may not specifically direct our courts to consider federal law in determining Indian claims, but federal law does require that this be done. *See ante* at 670. We find no due process violation in the legislature's failure to direct our courts specifically to consider federal law in areas where federal law is supreme. It is for the courts to determine where federal law is supreme and to apply it, regardless of directions from the state legislature.

## CONCLUSION

We hold, therefore, that Judge Goodfarb did not err in denying the various motions directed to the question of jurisdiction. Nor is he proceeding or threatening to proceed without or in excess of jurisdiction. The courts of this state have jurisdiction to adjudicate Indian claims to stream waters and may do so in a comprehensive, general proceeding in which the United States, as trustee of such claims, is joined as a party defendant. The provisions of article 20, ¶ 4 of our constitution constitute both a disclaimer of all right, title, and interest to Indian land as property, and a recognition of the absolute supremacy of the United States. They are not a cession of exclusive jurisdiction to the United States. The state of Arizona may exercise jurisdiction in Indian country where it acts in accordance with the will of Congress and not contrary to the right of Indian self-government. Where, as here, the assertion of jurisdiction is not contrary to the right of Indian self-government and, most importantly, is a response to the expressed will of Congress (the McCarran Amendment), the provisions of article 20, ¶ 4 permit assumption of state court jurisdiction. Nor do the procedures adopted by the legislature for the exercise of such jurisdiction violate the Arizona or federal constitutional due process guarantees.

Accordingly, we conclude that the trial court's comprehensive minute entry order of March 14, 1984 reaches the correct result for the correct reasons. It is approved.

Jurisdiction is accepted. Relief is denied.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, and CAMERON, JJ., concur.