WHITE MOUNTAIN APACHE TRIBE,
Plaintiff-Appellant,

v.

Donald P. HODEL, Secretary; Frank K.
Richardson, Solicitor; James H. Stevens, Area Director, Bureau of Indian
Affairs; et al., Defendants-Appellees.

No. 85–1721.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 14, 1985.

Decided March 7, 1986.

William H. Veeder, Washington, D.C.,
for plaintiff-appellant.

Martin W. Matzen, U.S. Dept. of Justice,
Washington, D.C., for defendants-appellees.

Before GOODWIN, NELSON and CANBY, Circuit Judges.

CANBY, Circuit Judge:

This is another case in the continuing dispute over Indian rights to water from the Salt River watershed in Arizona. In this appeal, the White Mountain Apache Tribe challenges the dismissal of several of its claims against officials of the U.S. Department of the Interior. The claims were primarily based on the government's allegedly poor performance as trustee for the Tribe's natural resources. The Tribe characterizes its action as raising one indivisible claim for "mismanagement." We conclude, however, that the complaint actually asserted various claims, several of which are also important to our decision in the companion appeal *United States v. White Mountain Apache Tribe,* 784 F.2d 917 (9th Cir.1986), also decided today.

## BACKGROUND

Currently pending before the Superior Court for Maricopa County, Arizona, is the

consolidated water rights determination proceeding entitled *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source, W–1 through W–4* ("W–1"). The United States is a party to W–1, in part because of its role as trustee for the Tribe and, accordingly, as holder of legal title to any water rights to which the Tribe may be beneficially entitled.

The Tribe, which inhabits the Fort Apache Indian Reservation in Arizona, has a serious interest in the outcome of W–1 because the headwaters of the Salt River, one of the rivers subject to the state adjudication, lie within the Reservation's geographical boundaries. Nonetheless, the Tribe strenuously objects to U.S. government participation on the Tribe's behalf in the Arizona proceeding, has refused to participate in W–1 itself, and has acted on various legal fronts to hamper or prevent the government's filing of a water claim on the Tribe's behalf. This resistance, understandable at first, has by now become an exercise in futility. A brief review of some of the related litigation will help place this case in context.

When W–1 began in 1979, the United States was joined as a party because any comprehensive adjudication of water rights in Arizona necessarily required adjudication of water rights held by the United States, either in its own behalf or as trustee for Indian tribes. The McCarran Amendment, 43 U.S.C. § 666,[1] and the U.S. Supreme Court decision in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 809–13, 96 S.Ct. 1236, 1242–44, 47 L.Ed.2d 483 (1976), provided strong support for the joinder of the United States as a party. Some questions concerning the Arizona court's jurisdiction and the adequacy of state proceedings in the case remained, however. The jurisdictional question centered on provisions in both the Arizona Enabling Act and the state's Constitution that disclaimed jurisdiction over Indian lands.

Before the United States was served as a party in W–1, several Indian tribes, including the White Mountain Apaches, removed the case to federal court in Arizona. At the same time, several tribes filed independent federal actions seeking adjudication of their water rights. The district court soon remanded W–1 to state court and dismissed all but one of the federal actions, which it stayed pending the outcome of W–1. *See In re Determination of Conflicting Rights to the Use of Water from the Salt River Above Granite Reef Dam*, 484 F.Supp. 778, 784 (D.Ariz.1980), *rev'd*, 668 F.2d 1093 (9th Cir.1982), *reinstated*, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983). Appeals in the federal actions followed, leading eventually to the decision by the U.S. Supreme Court in *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983). There, the Court held that the McCarran Amendment removed any limitation that statehood Enabling Acts or general federal Indian policy may have placed on state court adjudication of Indian water rights. *Id.* at 563–64, 103 S.Ct. at 3211–12. The Court also held that dismissal or stay of federal water rights actions brought by Indian tribes, pending parallel adjudication in the state courts, was proper under the doctrine of *Colorado River Water Conservation Dist. See San Carlos*, 463 U.S. at 569–70, 103 S.Ct. at 3214–15.

We enforced the mandate of *San Carlos* on remand in *Northern Cheyenne Tribe v. Adsit*, 721 F.2d 1187 (9th Cir.1983). There, we agreed that the federal actions should be stayed rather than dismissed. We also refused to address two issues raised by the tribes: (1) whether the state courts lacked jurisdiction under state law, and (2) whether the state procedures were adequate to

---

1. The McCarran Amendment states, in pertinent part:

   (a) Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source ... where it appears

   that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit....

adjudicate the tribes' water rights. We held that the first issue was entirely a matter for the state courts to decide and that the second was for them to decide in the first instance. *Id.* at 1188. The Arizona Supreme Court has since affirmed lower court rulings that state courts have jurisdiction and are an adequate and appropriate forum for the adjudication. *See United States v. Superior Court in and for Maricopa County,* 144 Ariz. 265, 697 P.2d 658 (1985). Over the Tribe's strenuous objections, the United States complied with state court orders to file initial and supplemental water claims on the Tribe's behalf, the latest on November 29, 1985.

As the *San Carlos* litigation progressed, the Tribe brought an action in federal district court in the District of Columbia to enjoin the federal government from filing a claim on the Tribe's behalf in W–1. *White Mountain Apache Tribe v. Smith,* No. 81–1205, slip op. (D.D.C. June 23, 1981), *aff'd mem.,* 675 F.2d 1341 (D.C.Cir.1982), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983). The district court dismissed that case, finding that the court lacked jurisdiction "over the Attorney General's exercise of litigating judgment" and that the Tribe had "an adequate remedy at law in [the W–1 proceeding] subject, as it is, to potential appellate review in the United States Supreme Court." Having failed in the District of Columbia, the Tribe then initiated an action in its own Tribal Court to achieve essentially the same result. The outgrowth of that lawsuit is the companion appeal in *United States v. White Mountain Apache Tribe,* 784 F.2d 917 (9th Cir.1986).

Following the Supreme Court decision in *San Carlos,* the Tribe initiated this action, which, despite the Tribe's protestations to the contrary, is really another collateral attack on the government's participation in W–1. In this action, the Tribe sought: (1) a declaration that, due to "irreconcilable conflicts of interest," the government [2] had mismanaged water resources belonging to the Tribe in order to increase water available to federal reclamation projects; (2) a declaration that the same conflicts of interest disabled the government from adequately representing the Tribe in any litigation to determine water rights; (3) a declaration that Arizona courts lack jurisdiction in W–1 to determine the Tribe's water rights; (4) an injunction to prohibit the federal government from taking any further action in W–1; and (5) a declaration quieting title to 14,000 acres of land that the Tribe contended were erroneously excluded from an 1887 survey of the Reservation. The district court dismissed with prejudice all claims except the mismanagement claim, which is still pending.[3] We affirm.

## DISCUSSION

### I. *Partial Judgment Under Rule 54(b)*

■ The Tribe first contends that its complaint raised but a single claim for mismanagement, rendering partial judgment under Rule 54(b) improper. We review for an abuse of discretion. *Alcan Aluminum*

---

**2.** The complaint did not name the United States as a party. Instead, various government officials, including the Secretary of the Interior and the Attorney General, were named defendants. We construe such an action as one taken against the United States itself. *See Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963).

Also named as defendants below were various officials of the State of Arizona. These defendants were dismissed by the district court in March 1984, a decision the Tribe does not contest here.

**3.** The district court's order of October 12, 1984, originally dismissed with prejudice all claims

raised in the Tribe's complaint. *See White Mountain Apache Tribe v. Clark,* 604 F.Supp. 185 (D.Ariz.1984). Following a motion to reconsider, the district court decided to dismiss the mismanagement claim without prejudice, a nonappealable order. *See Haskin v. Morton,* 456 F.2d 1071 (9th Cir.1972) (per curiam). Then, on February 14, 1985, the court, pursuant to Fed.R.Civ.P. 54(b), entered final judgment dismissing all other claims. The Tribe filed an amended complaint on the mismanagement claim, and it is still pending in district court. All of the other claims are encompassed by this appeal.

*Corp. v. Carlsberg Financial Corp.*, 689 F.2d 815, 817 (9th Cir.1982).

Without question, the Tribe approached this lawsuit with a single goal in mind: interference with the government's participation in W–1. Nonetheless, it is clear from the complaint that several distinct issues were raised in the district court. Indeed, in support of its motion for reconsideration, the Tribe characterized its mismanagement claim as separate and distinct from the issues surrounding government participation in W–1. In any event, we do not require that claims covered by a Rule 54(b) judgment be separate from and independent of other claims raised in a complaint. *Id.* There was no abuse of discretion.

## II. State Jurisdiction to Adjudicate W–1

■ As it has on numerous occasions in the past, the Tribe here again sought a ruling that Arizona courts had no jurisdiction to adjudicate the Tribe's water rights in W–1. The Tribe persists in misconstruing the McCarran Amendment and the decisions applying it. We find it difficult to respond to the Tribe's contentions at this late date other than to state flatly that the Tribe is wrong. The state court *does* have the authority to adjudicate tribal water rights in W–1. The Congress has said so, *see* McCarran Amendment, 43 U.S.C. § 666; the United States Supreme Court has said so, *see Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983); *Colorado Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); the Arizona Supreme Court has said so, *see United States v. Superior Court in and for Maricopa County*, 144 Ariz. 265, 697 P.2d 658 (1985); and we have said so, *see Northern Cheyenne Tribe v. Adsit*, 721 F.2d 1187 (9th Cir.1983). It is time that the Tribe accept the proposition as true.

The Tribe has much at stake in W–1. The Arizona courts will be deciding the Tribe's rights to water, probably its most precious resource. It is difficult to see how the Tribe's interest is served by its continued opposition to the presentation of *any* claim for that water to the state courts. Were the Tribe to succeed in its opposition, it might well lose all of its water.

The Tribe makes serious charges in its brief about gross mismanagement of the Tribe's water resources by the government. The Tribe contends that the water claim filed by the government on the Tribe's behalf in W–1 understates the Tribe's proper annual water allocation by tens of thousands of acre-feet. We intimate no view on the merits of these charges; the Tribe's claim for mismanagement is still pending in the district court. We note only that, insofar as these charges affect the amount of water to which the Tribe is entitled, they must be presented to the Superior Court of Maricopa County. If the Tribe is convinced, as it seems to be, that the United States cannot adequately represent the Tribe in W–1, then the remedy is for the Tribe to intervene in that proceeding, as the state courts have indicated that it may do. Should the Tribe fail to convince that court of the correctness of its position, the Tribe will, in due course, have its opportunity to present its contentions to higher state courts and to the United States Supreme Court. *See San Carlos*, 463 U.S. at 571, 103 S.Ct. at 3215–16. That route, rather than one of parallel or collateral proceedings in federal district court, is the proper path for the Tribe to follow in asserting the water rights claims that lie at the heart of this case. The district court therefore was correct to reject the Tribe's attempt to challenge in this proceeding the state court's jurisdiction in W–1.

## III. Conflict of Interests

■ The Tribe further contends that, even if the Arizona courts are empowered to adjudicate W–1, the United States should not be allowed to represent the Tribe's water rights due to an "irreconcilable conflict of interests." We likewise reject this contention.

The Tribe argues that, because the United States has its own water claims in the Gila River System and its sources, it has a

disabling conflict of interests. The Tribe asserts that the government plans to understate claims for Indian water rights in order to inflate rights ultimately granted to the government's Bureau of Reclamation.

The charge is a serious one, and in light of history, it cannot be dismissed as implausible on its face. Its truth or falsity, however, cannot be determined in advance of the fact. The actual conduct of the W–1 litigation by the government, and its results, are yet to unfold. The Tribe's related contention that the United States is rendered incapable *per se* of representing the Tribe because of its representation of conflicting federal interests finds support in the law of private fiduciaries. The government is not, however, a private fiduciary. The Supreme Court has made clear that the federal government's dual role as trustee for the Indians as well as representative of other federal water interests does not disable it from making water claims for the Indians. In *Nevada v. United States*, 463 U.S. 110, 128, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983), the Court declared:

> [I]t is simply unrealistic to suggest that the Government may not perform its obligation to represent Indian tribes in litigation when Congress has obliged it to represent other interests as well. In this regard, the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests .... The Government does not "compromise" its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do.

*See also id.* at 140–42, 103 S.Ct. at 1923–24; *Arizona v. California*, 460 U.S. 605, 627–28, 103 S.Ct. 1382, 1395–96, 75 L.Ed.2d 318 (1983).

Of course, the government remains under a firm obligation to represent the Tribe's interests forcefully despite its other representative obligations. *Nevada v. United States*, 463 U.S. at 142, 103 S.Ct. at 2924. The government's failure to do so might well give rise to some claim for breach of duty. But, as we have said, the Tribe's best assurance that its interests will be protected in this unusual proceeding is to avail itself, if there is still time, of the opportunity the Arizona courts have extended to it to intervene in W–1. *See San Carlos*, 463 U.S. at 566 n. 17, 103 S.Ct. at 3213 n. 17; *supra* Part II.

### IV. *Action to Quiet Title*

Finally, the Tribe attacks the district court's dismissal of the Tribe's request to quiet title to some 14,000 acres of land the Tribe claims were erroneously excluded from its Reservation because of a faulty 1887 survey by Deputy Surveyor C. Wallace.[4] The disputed land is now part of the Sitgreaves and Apache National Forests.

The district court dismissed this claim under the doctrine of *res judicata.* After an extensive and cogent review of this dispute, the court concluded that the claim was either settled or foreclosed by proceedings before the Indian Claims Commission in 1972. After an independent review of Commission reports and the pleadings involved, we find we cannot improve upon Judge Muecke's analysis. *See White Mountain Apache Tribe v. Clark*, 604 F.Supp. 185, 187–89 (D.Ariz.1984).

The Indian Claims Commission heard arguments from the Tribe that it had been wrongfully deprived of some lands lying outside its Reservation boundary. After years of hearings, the Commission concluded that the Tribe was correct and that it was entitled to compensation for the fair market value of the lands wrongfully taken. *San Carlos Apache Tribe v. United States*, 21 Ind.Cl.Comm. 189 (1969) ("Docket 22–D"). Three years later, the Commis-

---

**4.** This claim was apparently raised in this action either because the Tribe wanted those 14,000 acres included for the purpose of calculating water rights in W–1 or because the exclusion of the land without compensation was another example of alleged government mismanagement of the Tribe's natural resources.

sion ratified a settlement in the Tribe's favor for $4.9 million. *San Carlos Apache Tribe v. United States*, 28 Ind.Cl.Comm. 399 (1972). As part of that settlement, the Tribe stipulated to a final judgment that, *inter alia,*

> finally dispose[d] of *all* rights, claims or demands which the [Tribe] asserted or *could have asserted* with respect to the subject matter of the suit in Docket 22–D, and [the Tribe] shall be barred thereby from asserting any such rights, claims or demands against [the United States] in any other or future action.

*Id.* at 402 (emphasis added).

The Tribe now contends that this compensation was for lands outside the Reservation improperly taken, not for lands taken because of error in the 1887 Wallace Survey. For the reasons thoroughly discussed by the district court, this argument must fail. In 1967, at the Tribe's request, the Bureau of Indian Affairs reviewed the Wallace Survey and concluded that it was substantially accurate. The Tribe was well aware of this determination when the Indian Claims Commission began its final resolution of the longstanding claim in Docket 22–D. The only way the Commission could have concluded that land outside the Reservation boundary was taken was by reference to the Reservation boundary as it was established at the time of the Commission proceedings. As the district court put it, "That boundary *is* the Wallace Survey boundary." *White Mountain Apache Tribe v. Clark*, 604 F.Supp. at 188 (emphasis in original). No other reference could have been intended. Thus, the district

---

**5.** Even if the Tribe's quiet title claim were not *res judicata,* it would face additional substantial hurdles that our decision makes it unnecessary to reach. There is a twelve-year limitation period applicable to actions brought under the Quiet Title Act, 28 U.S.C. § 2409a(f); *see Grosz v. Andrus,* 556 F.2d 972, 974 (9th Cir.1977) (Indian claimants; twelve-year limitation period strictly construed). The Tribe knew no later than June 12, 1967, that the government intended to stand by the Wallace Survey boundary; that was the date the government responded negatively to the Tribe's request to review the Survey's accuracy. The complaint in this case was filed October 20, 1983, more than sixteen years later.

court's conclusion that the claim is barred, either by settlement or by failure to assert it, is fully supported, and we will not disturb it.[5]

## CONCLUSION

We find no error in the district court's disposition of this case. The judgment of the district court is AFFIRMED.

The government also contends that the Tribe's claim had to be brought before the Indian Claims Commission. Under the Indian Claims Commission Act of 1946, 60 Stat. 1049 (1946), *codified as amended at* 25 U.S.C. §§ 70a to 70v–2 (1976), all claims within the Commission's jurisdiction that had accrued by August 13, 1946, had to be filed with the Commission by August 13, 1951, or be forever barred. The government argues that the Tribe's claim is one for taking of lands without compensation, which fell within the Commission's jurisdiction. 25 U.S.C. § 70a(4) (1976).