972 P.2d 244

## DIVISION OF OCCUPATIONAL SAFETY AND HEALTH OF THE INDUSTRIAL COMMISSION OF ARIZONA, Petitioner,

v.

## CHUCK WESTENBURG CONCRETE CONTRACTORS, INC., dba Pima Concrete, Inc., aka Chuck Westenburg Concrete Contractor, Inc., Respondent.

No. 1 CA–IC 97–0109.

Court of Appeals of Arizona,
Division 1, Department B.

Dec. 24, 1998.

As Amended March 3, 1999.

Anita R. Valainis, Chief Counsel, The Industrial Commission of Arizona by Laura L. McGrory, Phoenix, for Petitioner Division of Occupational Safety and Health of the Industrial Commission of Arizona.

Law Office of John E. Tully, P.C. by Barbara S. Burstein, Tucson, for Respondent.

## OPINION

THOMPSON, Presiding Judge.

¶ 1 This is a statutory special action review of Arizona Occupational Safety and Health Review Board (review board) findings and order reversing an administrative law judge's decision that the respondent employer, Chuck Westenburg Concrete Contractors, Inc. (Westenburg Contractors) had violated

three Occupational Safety and Health Administration (OSHA) regulations. The sole stated basis for this reversal was the review board's conclusion that Westenburg Contractors was not responsible for the soil retention system at the excavation, which failed.

¶2 The Division of Occupational Safety and Health of the Industrial Commission of Arizona (ADOSH) timely petitioned for review. For the following reasons, we set aside the review board's findings and order.

### FACTUAL AND PROCEDURAL HISTORY

¶3 Mark Douglas Norton testified that in March 1993, he was an ADOSH safety compliance officer conducting workplace inspections to determine compliance with OSHA regulations. On March 12, 1993, he investigated an accident at a jobsite at 5301 E. Grant Road in Tucson, where a parking structure was being constructed. He stated that he spent several days at the site, which he described as a large excavation with some concrete walls already poured and others covered by a soil protection system. In the course of his investigation, he examined the excavation area, interviewed employees of Westenburg Contractors and T.L. Roof & Associates (Roof), took photographs, and retained an engineer, Claude Baker, to assist him. As a result of this investigation, he recommended that three citations be issued to Westenburg Contractors as well as citations to the general contractor, Roof, and the engineering firm that designed the soil protection system, Terracon.

¶4 Norton testified that the accident occurred on Friday, March 12, 1993. He stated that two Westenburg Contractors employees were working near the west wall of the excavation when a large portion of the west wall collapsed completely burying one employee, who died, and partially burying another, who escaped serious injury.

¶5 Two days before this accident, sandy soil had been noted to be sloughing off the bottom of the west wall on the north side of the elevator shaft pit where Westenburg Contractors' employees were digging footings. Westenburg Contractors' foreman, Jesus Robles, Sr. (Robles, Sr.), removed his workers from this area and reported the sloughing to Roof's project superintendent, Juan Roman. Roman attempted to control the sloughing by setting wooden forms and pouring concrete slurry over the area that was sloughing, but the forms broke. Roman decided that no employees would be allowed to work in the elevator shaft area until the sloughing could be remedied.

¶6 Norton testified that the employees he interviewed indicated that the sloughing on the west wall had continued unabated until the accident. During his investigation, Norton observed a number of factors that could have affected the stability of the excavation, such as heavy rainfall, a previous excavation adjacent to the west wall, potholes dug adjacent to the west wall that had collected water, and vibration from a paved, well-traveled city road running parallel to the west wall.

¶7 Norton also testified that he became aware that neither Roof nor Westenburg Contractors had a "competent person" on the jobsite in accordance with OSHA regulations. He found that none of Westenburg Contractors' employees had any knowledge or training in the OSHA excavation standard, which would allow them to recognize potential hazards. Finally, he stated that a competent person would have realized that the sloughing that was occurring along the west wall indicated that the entire west wall and its bank protection system needed to be reevaluated.

¶8 Jesus Alfredo Robles (Robles) worked as a laborer for Westenburg Contractors in March 1993 at the TMC parking garage. His father, Robles, Sr., was his foreman. He testified that he had never worked in an excavation before and that the only safety training he had received consisted of instructions to wear goggles, to use work shoes, to work in pairs, and not to climb on the soil retention fence.

¶9 Before the accident in question, he had noted dirt sloughing off the bottom of the west wall into the footings near the elevator shaft. He stated that Westenburg Contractors' crew cleaned out the footings, but the following day more dirt had sloughed off

into them again. Robles testified that at that point, his father told Westenburg Contractors' employees not to go near the west wall until he could speak to Roman about the falling dirt.

¶ 10   Robles testified that on March 12, 1993, Roman instructed Robles, Sr. to prepare for a concrete pour. Robles, Sr. then sent two employees to do the preparatory work along the west wall, but he told them to avoid the elevator shaft. Robles testified that although the two employees were approximately thirty to forty feet from the area on the west wall where the sloughing had been occurring, when the wall fell it did so from north to south, in a domino effect, beginning where the prior sloughing had been and traveling to the area where the two employees were working. Robles stated that he helped dig out the buried worker, Rodolfo De La Cruz, who was killed in the accident.

¶ 11   Robles, Sr. testified that in March 1993, he was Westenburg Contractors' working foreman at the TMC parking garage. He stated that he was responsible for approximately twenty employees on that site. He testified that he had worked for Westenburg Contractors for eleven years and had never had any training in soil classification, general workplace safety, or excavation safety.

¶ 12   Robles, Sr. testified that on March 10, 1993, the west wall had been sloughing into the elevator shaft footing on the north side of the elevator shaft. He stated that he reported to Roman that sand was running into the footing, and he could not keep it cleaned out. He testified that Roman told him to get his crew out of that area. Roman then tried to stop the sand by setting plywood forms and pouring concrete slurry over the area. Robles, Sr. stated that the forms broke, but the concrete and forms in the footing made it difficult to see where the sand had been running.

¶ 13   Robles, Sr. testified that on the morning of March 12, 1993, Roman attended a contract meeting with Tom Roof, Chuck Westenburg, and several others. Immediately after that meeting, Roman told him that a concrete pour had to be performed that day and to place bulkheads on either side of the elevator shaft footing. Robles, Sr. stated that he went to the west wall with De La Cruz and George Vega (Vega) and did a visual inspection of the wall to see if any soil was running out from under the soil protection fence. He testified that the wall looked solid, so he left De La Cruz and Vega to place the bulkheads. Shortly thereafter, approximately thirty-five feet of the three-hundred foot west wall collapsed killing De La Cruz.

¶ 14   Robles, Sr. testified that he was not familiar with the "competent person" requirement. He stated that it was not his job as a subcontractor to inspect the jobsite daily. Further, he had no authority to alter the soil retention system. Robles, Sr. testified that he had never walked around the top of the west wall so he had never seen any potholes or cracks. He stated that he stayed inside the excavation where his work was performed.

¶ 15   Armando Montillo (Montillo) testified that in March 1993, he was a field superintendent with Westenburg Contractors overseeing the cement crew working at the TMC parking garage. He was Robles, Sr.'s direct supervisor. Montillo testified that Robles, Sr. had the on-site authority to stop the work and remove his crew if he observed an unsafe condition. But he noted that neither he nor Robles, Sr. had any authority to change the soil retention system. Montillo stated that he never was aware of any sloughing on the west wall nor any concerns that the west wall might fall. Finally, he was unaware that OSHA had an excavation standard or a competent person requirement.

¶ 16   Charles E. Westenburg, the president and treasurer of Westenburg Contractors, testified that his company was performing the concrete work on the new TMC parking garage. Westenburg testified that he never had walked inside the excavation or around its perimeter. Further, he had not heard of the "competent person" requirement before this injury and was not familiar with nor had any training in OSHA's excavation standard. He testified that Robles, Sr. was directly responsible for the safety of Westenburg Contractors' employees on the

jobsite, but he had not provided Robles, Sr. with any excavation safety training.

¶ 17 Westenburg testified that he entered into a subcontract with Roof to provide concrete services for this job. He stated that the contract required him to have "competent supervision" on site, i.e., Robles, Sr. With regard to the soil retention system, Westenburg testified that he had no knowledge about it. He stated that Westenburg Contractors did not install it and had no authority to correct any problems with it.

¶ 18 Jack L. Mickel, Ph.D (Dr. Mickel), testified that he was an engineer specializing in soils and excavations and was one of the authors of Subpart P, OSHA's excavation standard. He stated that the excavation standard is intentionally written for regular working people who have received competent person training and not for professionals. Dr. Mickel testified that with minimal training, Robles, Sr. could have learned to evaluate the soil at a jobsite and recognize hazardous conditions in an excavation.

¶ 19 Dr. Mickel testified that a competent person is one who is trained to classify soil, to recognize hazardous conditions, and has the authority to do something about those conditions. He stated that in some situations the competent person's authority may be limited to removing his workers from a dangerous area until someone else can correct the problem. He noted that conditions in an excavation are constantly changing, and for that reason, it is critical to the employees' safety to have a competent person who is constantly vigilant to these changing conditions. Dr. Mickel testified that employees never should have been sent to work along the west wall on March 12, 1993.

¶ 20 Dr. Mickel testified that Westenburg Contractors was responsible for its own employees' safety and could not rely on others to do this for it. For that reason, each subcontractor was responsible to have a competent person trained under the OSHA standard. He agreed that Westenburg Contractors had a right to rely on the soil protection system installed by Roof, but he stated that Westenburg Contractors also had an obligation to perform inspections of its own. Finally, Dr. Mickel stated that Westenburg

Contractors' employees lacked the necessary training to work in an excavation.

¶ 21 Claude Baker (Baker), a professional engineer, testified that in March 1993, he was hired by ADOSH as a consultant on this accident. He stated that he was knowledgeable about OSHA regulations because he helped to develop the trench and excavation standard and the field operations manual. He also helped to create ADOSH and to train its safety compliance officers.

¶ 22 On March 18, 1993, Baker examined the jobsite with Norton. He stated that the efficacy of a soil nailing system such as that designed by Terracon depends on proper installation. Baker testified that the system failed on the west wall because of improper installation and improper design. He stated that there were indications of imminent failure that would have been easily apparent to a trained, competent person. These included sand runs on the face, pocketing on the face, minor cave-ins, and cracks along the top of the west wall parallel to an old excavation.

¶ 23 Baker testified that when sand began running out from under the soil retention fence on March 10, 1993, the west wall's failure became inevitable because it was losing its foundation. He stated that it was prudent to remove the employees from that area on March 10, 1993. But he noted that there was no safe area for the employees to return to on March 12, 1993, because at that point, the whole west wall was suspect. He testified that when the west wall failed, it fell from north to south until it reached a properly grouted rebar rod.

¶ 24 Baker testified that OSHA regulations require every employer to have a competent person on the jobsite. He stated that Robles, Sr. was competent for concrete work but not for excavations. Baker testified that no one he interviewed from Westenburg Contractors had any soil or excavation training. It was his opinion that Westenburg Contractors did not have a right to rely on others for the safety of its employees. He stated that Westenburg Contractors was ultimately responsible for the safety of its own employees and that responsibility could not be delegated. For that reason Westenburg Contrac-

tors was obliged to review the OSHA regulations and have its employees trained with regard to the excavation standard. Baker noted that pursuant to its contractor's license and the subcontract with Roof, Westenburg Contractors agreed to follow OSHA regulations.

¶ 25 ADOSH issued three citations to Westenburg Contractors for violation of OSHA regulations. These citations provide:

(1) 29 C.F.R. § 1926.651(k)(1): An inspection of the excavations, the adjacent areas, and protective systems was not conducted by the competent person[1] prior to the start of work and as needed throughout the shift:

(a) Jobsite at 5301 E. Grant Rd., Tucson, AZ, Chuck Westenburg, Inc.: Employees were working in close proximity to a vertical wall 16' in height,[2] protected by a tieback system, but the employer did not ensure a competent person conducted daily inspections of the excavation or the adjacent areas to identify potential hazards prior to the start or as needed throughout the shift.

(2) 29 C.F.R. § 1926.651(k)(2): Where the competent person found evidence of a situation that could result in a possible cave-in, indications of failure of protective systems, hazardous atmospheres, or other hazardous conditions, exposed employees were not removed from the hazardous area until the necessary precautions had been taken to ensure their safety:

(a) 5301 E. Grant Rd., Tucson, AZ, west wall of excavation: Employees were working adjacent to the west wall of the excavation which was dug to a 12' depth then had footing and a shear dug an additional 4' making overall depth 16', and sections of the wall were noted to have been sloughing off on March 10, 1993[,] to the point where corrective measures were attempted, failed and employees were pulled out of the area

but were allowed to go back on March 12, 1993[,] without correcting the existing problem.

(3) 29 C.F.R. § 1926.21(b)(2): The employer did not instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury:

(a) Jobsite at 5301 E. Grant Rd., Tucson, AZ, Chuck Westenburg, Inc., concrete contractor: The employer did not instruct employees in the recognition and avoidance of unsafe conditions and the applicable standards in that employees were allowed to work in close proximity to/adjacent to vertical earthen walls up to 16' height and were not aware of the standards or hazards to which they were exposed, such as falling materials or walls.

¶ 26 Westenburg Contractors timely requested an Arizona Industrial Commission (ICA) hearing, and two lengthy hearings were held. Two depositions were also filed in lieu of additional hearing testimony. Following these hearings, the administrative law judge entered a twelve-page decision, which summarized all of the evidence presented, recited applicable case law, and affirmed the citations and penalties. Westenburg Contractors timely requested review before the review board, which summarily reversed the administrative law judge's decision. ADOSH brought this petition for special action. *See* A.R.S. § 23–423(I).

## STANDARD OF REVIEW

¶ 27 This court has jurisdiction to review an order of the review board and may affirm, modify, or set aside in whole or in part that order. *See* A.R.S. § 23–423(I). This court will affirm the review board's findings of fact if they are supported by substantial evidence. *See id.; McAfee–Guth-*

---

1. "One who is capable of identifying existing and predictable hazards in the surroundings, or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective mea-

sures to eliminate them." 29 C.F.R. § 1926.650(b).

2. This area included an additional four-foot deep excavation for the elevator shaft footing.

*rie, Inc. v. Division of Occupational Safety and Health,* 128 Ariz. 508, 510, 627 P.2d 239, 241 (App.1981).

¶ 28   Arizona has adopted the Federal Occupational Safety and Health Standards, Code of Federal Regulations, Title 29, Part 1926. A.R.S. § 23–410; Ariz. Admin. Code (A.A.C.) R20–6–601 (1997). This court has recognized that federal case law is persuasive in interpreting those regulations. *See APS v. Industrial Comm'n,* 178 Ariz. 341, 343 n. 3, 873 P.2d 679, 681 n. 3 (1994).

## DISCUSSION

¶ 29   ADOSH raises seven issues on appeal:

(1) whether the review board was so biased as to preclude ADOSH from receiving due process of law;

(2) whether the review board's decision is legally insufficient for failure to make findings of fact and conclusions of law;

(3) whether Westenburg Contractors committed a wilful or serious violation of 29 C.F.R. § 1926.651(k)(1) by failing to have a competent person performing daily inspections at the excavation site;

(4) whether Westenburg Contractors committed a wilful or serious violation of 29 C.F.R. § 1926.651(k)(2) by allowing its employees to return to a hazardous area of the excavation before necessary precautions were taken;

(5) whether Westenburg Contractors committed a serious violation of 29 C.F.R. § 1926.21(b)(2) by failing properly to train its employees in the recognition of excavation hazards;

(6) whether the review board erred by deleting the penalty that the administrative law judge awarded under A.R.S. § 23–418.01; and,

(7) whether the review board erred by awarding attorneys' fees and transcription costs to Westenburg Contractors.

¶ 30   ADOSH first argues that the review board was so biased as to deny it due process of law. The basis for this argument is disparaging remarks made by several members of the review board during its consideration of this case. Westenburg Contractors responds that these members were not biased; they merely came to the process with their own perspectives.

¶ 31   The review board consists of five members appointed by the governor and must include one representative of management, one representative of labor, and three members of the general public. *See* A.R.S. § 23–422(A). The review board is charged with conducting a *de novo* review of the record received from the administrative law judge. *See* A.R.S. § 23–423(F). The board may affirm, reverse, modify, or supplement the administrative law judge's decision. *See* A.R.S. § 23–423(G). All decisions of the review board must be by majority vote and be in writing. *See* A.R.S. § 23–423(H).

▮. ¶ 32   This court has recognized that due process of law contemplates a "fair trial in a fair tribunal." *United States v. Superior Court,* 144 Ariz. 265, 280, 697 P.2d 658, 673 (1985) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). Although there is a presumption of honesty and integrity among those serving as adjudicators, a showing that the mind of a decision maker is "irrevocably closed" on a particular issue being decided will constitute disqualifying prejudgment. *Havasu Heights v. Desert Valley Wood,* 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App.1990).

¶ 33   In this case, ADOSH objects to statements on the record by two members of the review board. We agree that some unfortunate remarks were made on the record:

> MR. VOYLES:  ... I don't understand why OSHA cites some of these people.
>
> MS. SKALSKY: Because they have some folks out there that don't know what they're doing.
>
> MR. VOYLES: Jack [Dupont] [a board-member] told me just yesterday they have to make a job for themselves.
>
> MS. SKALSKY: There's a lot of stuff going on that needs to be looked at.
>
> . . . .
>
> MS. SKALSKY: Sometimes you have folks that you hire that have a concept of what they are supposed to do different

from what the intent of OSHA is. That is our job, to make sure these personalities are not dominant.

. . . .

MS. SKALSKY: You know, when you're starting to cite them you should be just as responsible as we're asking other people to be and be darn sure when you do it that you have a case.

If OSHA has to fork up some of the attorney's fees then those guys may get some direction from their higher ups to make sure what they're doing.

. . . .

MS. SKALSKY: It's time to get tough.

MR. VOYLES: I think we should do that.

¶ 34 Although some of these comments were ill-advised, and injudicious, especially in light of the fatality, our disposition on other grounds makes it unnecessary for us to determine whether they display an irrevocably closed mind.

■ ¶ 35 ADOSH next argues that the review board's written decision is legally inadequate for this court to review and should be reversed. Westenburg Contractors responds that A.R.S. § 23–423(H) requires only that the review board's decision be in writing and by a majority, and therefore, it is sufficient.

¶ 36 The review board's findings and order consist of three pages, one of which is an introductory paragraph and one of which is a signature page. Only one paragraph on page two discusses the facts and merits of this case:

> The Board's reason for the reversal of the Decision of the ALJ was that there was a failure in the retaining fence anchor system that was designed and installed by parties other than the appellant. The Board noted that the appellant had initially discovered the deficiencies in the retention system and removed its people and alerted the general contractor, T.L. Roof. It was T.L. Roof that caused the design to be

prepared by an engineer of its choosing and it was T.L. Roof that had actually installed the retention anchor system. WESTENBURG had no authority to modify the system.

¶ 37 ADOSH argues that *Post v. Industrial Comm'n*, 160 Ariz. 4, 770 P.2d 308 (1989), supports its argument that the review board's findings and order is legally insufficient. In *Post*, our supreme court set aside an administrative law judge's award in a workers' compensation case because it contained no stated resolution of the conflicting testimony, no findings of ultimate fact, no conclusions on the legal issues, and was so lacking in specificity that it could not be reviewed. *Id.* at 7–9, 770 P.2d at 311–13. In so doing, the court reassessed the specificity necessary for a legally sufficient award and concluded that the award should specify the basis for the ultimate disposition and the evidence supporting that basis. *Id.* In reaching its conclusion, the court relied on the Administrative Procedures Act:

> General administrative procedure law requires that any final decision of an administrative law judge include findings of fact and conclusions of law. . . . The judge must separately state the findings and conclusions, and the findings "*shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings*" (emphasis added). . . . Here, the judge merely recited several factual disputes in the testimony. Not only did he not make a "concise and explicit statement," he made no findings at all. The ultimate finding, that the judge "[c]onsider[ed] the evidence in its entirety," falls far short of the type of dispute resolution the statute requires for administrative decisions and orders.[3]

*Id.* at 7–8, 770 P.2d at 311–12.

¶ 38 In this case, we agree with ADOSH. We believe that the review board's decision is legally inadequate. The record in this case is voluminous and includes 500 pages of hearing transcripts and 150 pages of deposition

---

3. The court also recognized that Chapter 41 of the Administrative Procedures Act applies to various entities contained in the general definitional statute, A.R.S. § 41–1001. This provision includes a "board" within the entities covered by this chapter. *Id.* § 41–1001(2).

testimony. The board's findings and order contained no findings of fact or resolution of the conflicting evidence. It contained no citations of law and did not specifically mention any of the three citations ADOSH issued to Westenburg Contractors or the legal issues associated with each citation.

¶ 39 The review board found only that Westenburg Contractors was not responsible for the soil retention system, and it was the failure of that soil retention system that caused the fatality in this case. None of the three citations Westenburg Contractors received was based on an assertion that Westenburg could have modified the soil retention system or prevent its failure. For these reasons, we conclude that the findings and order are legally insufficient and should be reversed.

■ ¶ 40 ADOSH next argues that the review board erred by failing to find that Westenburg Contractors had violated 29 C.F.R. § 1926.652(k)(1) which provides:

> Daily inspections of excavations, the adjacent areas, and protective systems shall be made by *a competent person* for evidence of a situation that could result in possible cave-ins, indications of failure of protective systems, hazardous atmospheres, or other hazardous conditions. An inspection shall be conducted by the competent person prior to the start of work and as needed throughout the shift. Inspections shall also be made after every rainstorm or other hazard increasing occurrence. These inspections are only required when employee exposure can be reasonably anticipated.

(Emphasis added.) For purposes of excavations, a competent person is defined as "one who is capable of identifying existing and predictable hazards in the surroundings, or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them." 29 C.F.R. § 1926.650(b).

■ ¶ 41 Every Arizona employer is responsible for providing his employees with a safe place of employment. *See* A.R.S. § 23–403(A). In that regard, Arizona has adopted the federal OSHA construction standards and requires all employers in the construction industry to comply with the federal regulations in part 1926 related to occupational safety and health. *See* A.R.S. § 23–403(B); A.A.C. R20–5–601. Therefore, Westenburg Contractors was required to have a competent person on site at the TMC parking garage project.

■ ¶ 42 Westenburg Contractors responds that it was not required to have a competent person on site based on the multi-employer work site defense. It argues that Roof was the general contractor in charge of the safety of the entire job site, through its project superintendent, Roman. It argues that Roman was the competent person with the authority to abate any hazards, and, as a subcontractor under Roof, Westenburg Contractors did not have that authority.

¶ 43 This court discussed the multi-employer work site doctrine in *APS v. Industrial Comm'n,* 178 Ariz. 341, 873 P.2d 679 (App. 1994). In *APS,* this court relied on the two central OSHA cases in this area: *Anning–Johnson Co.,* 4 OSHC 1193 (Rev. Comm'n 1976) and *Grossman Steel & Aluminum Corp.,* 4 OSHC 1185 (Rev. Comm'n 1975). *APS,* 178 Ariz. at 344, 873 P.2d at 682. The court noted that these cases held

> [t]hat each employer at a construction site is responsible for assuming that its conduct does not create hazards to any employees at the site; and, because of the supervisory nature of a general contractor and its ability to obtain abatement of hazards, the general contractor is responsible for violations it reasonably could have been expected to prevent or abate by reason of its position.... *Both cases went on to say that each employer is expected " 'to make a reasonable effort to detect violations of standards not created by it but to which its employees have access and, when it detects such violations, to exert reasonable efforts to have them abated or take such other steps as the circumstances may dictate to protect its employees.' "* ... Thus, the general rule we are left with is that an employer commits a violation when it fails to comply with a safety or health standard

and its own employees or those of another are exposed to the resulting hazard.

*Id.* (citations omitted) (emphasis added).

■ ¶ 44 Westenburg Contractors argues that because any competent person it appointed would not have had the authority to abate a cave-in hazard to its employees by taking corrective measures with regard to the soil protection system, it was not required to have a competent person and was entitled to rely on Roman since he had that authority. We disagree. A subcontractor on a multi-employer work site is responsible for the safety of its own employees and must take all reasonable and realistic steps to protect them, as an alternative to literal compliance with an applicable safety regulation, which may be the responsibility of the general contractor. *See Electric Smith, Inc. v. Secretary of Labor,* 666 F.2d 1267, 1270 (9th Cir.1982).

¶ 45 In *Electric Smith,* a general contractor and all three of its subcontractors received identical citations for violations of OSHA regulations related to the guarding of open-sided floors, platforms, runways, and wall openings during the construction of a three-story office building. *See id.* at 1268. The general contractor had assumed full responsibility for providing all barricades, stairs, lights, and other safeguards for the safety and protection of all employees working at the site. *See id.* at 1270. Smith's duties under its contract with the general contractor were limited to the preparation and installation of wiring, fixtures, and electrical equipment in the building. *See id.* For this reason, the court found that erecting the missing guarding at the jobsite was outside of Smith's authority, which precluded it from literal compliance with the cited OSHA guarding regulations. *See id.* at 1269.

¶ 46 Nevertheless, the court recognized that Smith was required to take alternative reasonable and realistic measures to protect its own employees. *See id.* at 1268. Smith complained repeatedly to the general contractor about the missing guarding and had instructed its employees "to remain on the first floor, away from the hazardous areas, as much as possible," and "that 'if you have to go to the second floor, use the southeast

stairway next to the wall, so if you trip, there is something to brace yourself against, the block wall.'" *Id.* at 1271–72. The court dismissed the citations against Smith, holding that its actions were sufficiently reasonable and realistic alternative measures to literal compliance with the OSHA regulations. *See id.* at 1273–74.

¶ 47 In this case, it is clear that Westenburg Contractors was not responsible for the soil retention system selected by Roof, nor did it have any authority to order or make corrective measures to the soil retention system. But Westenburg Contractors was not cited for the failure of the soil retention system. Instead, it was cited for failure to have a competent person on site who could have recognized the warning signs that the soil retention system might not have been performing as it should. Without someone so trained, Westenburg Contractors could not take reasonable and realistic steps to protect its employees because it was ignorant of the hazards that were present. For these reasons, we disagree that the multi-employer work site doctrine excuses Westenburg Contractors from having a trained competent person on site. We believe the review board erred by reversing this citation based on its finding that Roof was responsible for the soil retention system.

■ ¶ 48 The next issue is whether Westenburg Contractors' failure to have a competent person on site as required by the OSHA regulations was a wilful or serious violation of the regulations. A serious violation of OSHA regulations occurs when three elements are present:

1. The existence of a condition or practice in a place of employment which violated a regulation.

2. The condition produced a substantial probability that death or serious physical injury could occur.

3. The employer had actual or constructive knowledge of the violation.

A.R.S. § 23–401(12); *Division of Occupational Safety & Health v. Ball, Ball, & Brosamer,* 172 Ariz. 372, 374, 837 P.2d 174, 176 (App.1992). The standard of proof for a wilful violation is more stringent and re-

quires evidence that the employer had actual knowledge of the OSHA regulation and acted voluntarily with intentional disregard of or plain indifference to that requirement. *See id.* at 377, 837 P.2d at 179.

¶ 49   Although ADOSH argues that Westenburg Contractors is guilty of both a wilful and a serious violation of 29 C.F.R. § 1926.651(k)(1), insufficient evidence establishes that Westenburg Contractors had the requisite knowledge and state of mind for a wilful violation. At the ICA hearing, Westenburg testified that he was the president of Chuck Westenburg Concrete Contractors and had entered into the subcontractor agreement with Roof to perform the concrete work at the TMC parking garage. This subcontract expressly provided that Westenburg Contractors would adhere to all applicable OSHA regulations in the performance of its contract. Roof testified that adherence to OSHA regulations is also a requirement for holding a contractor's license.

¶ 50   Despite these requirements, Westenburg testified that he was not familiar with OSHA's excavation standard and had never heard of a "competent person" before this injury. He stated that he had never had any training with regard to this standard nor had he provided any such training to his working foreman on the job, Robles, Sr. Further, Westenburg believed that Roof was responsible for the overall safety of the job site. While this sufficed to support a finding that Westenburg Contractors should have known, i.e., had *constructive* knowledge, of the applicable OSHA regulations, there is no evidence that it had *actual* knowledge of the requirement to have a competent person on site.

¶ 51 ADOSH also cited Westenburg Contractors for a wilful or serious violation of 29 C.F.R. § 1926.651(k)(2):

> Where *the competent person* finds evidence of a situation that could result in a possible cave-in, indications of failure of protective systems, hazardous atmospheres, or other hazardous conditions, exposed employees shall be removed from the hazardous area until the necessary precautions have been taken to ensure their safety.

(Emphasis added.)

¶ 52   We interpret this regulation as one intended to govern the appropriate response when the competent person discovers a potential hazard at the jobsite. Because the uncontradicted evidence of record establishes that Westenburg Contractors had no competent person on site, the evidence does not support a finding that Westenburg Contractors violated this regulation. Westenburg Contractors' failure was to have anyone on site trained to recognize potential hazards under subsection (k)(1).

¶ 53   Finally, ADOSH cited Westenburg Contractors for a serious violation of 29 C.F.R. § 1926.21(b)(2):

> The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.

¶ 54   To comply with this regulation, an employer must instruct its employees about the hazards they may encounter on the job and the regulations applicable to those hazards. *See Secretary of Labor v. Concrete Construction Co.,* 15 OSHC 1614, 1619 (Rev. Comm'n 1992).

¶ 55   In this case, Norton testified that during his accident investigation, he did not find any Westenburg Contractors employee that had been trained in the excavation standard. This was consistent with the testimony from Westenburg and his employees at the ICA hearing. None of them testified that they had received any training in the excavation standard. This was also supported by Westenburg Contractors' expert, Brian Murphy, who testified that he was unaware of any training for Westenburg Contractors' employees that would allow them to determine whether the excavation was safe. Despite what appears to be uncontradicted evidence that there was no excavation training, the review board reversed this citation without explanation. This was clear error.

¶ 56 ADOSH next argues that the review board erred by reversing the $25,000 penalty it assessed to Westenburg Contractors for a wilful violation causing an employee's death. A.R.S. § 23–418.01 provides in relevant part:

A. An additional penalty of twenty-five thousand dollars shall be assessed by the commission against an employer who is assessed a penalty under § 23–418, subsection A for each employee injury resulting in permanent disability or death if the commission finds all of the following:

1. The employee injury resulting in permanent disability or death was caused by the violation for which the employer is assessed a penalty under § 23–418, subsection A [a wilful violation].

2. Compensation benefits are paid to the injured employee, or in the event of death, his dependents, under chapter 6 of this title.

3. The violation for which the employer is assessed a penalty under § 23–418, subsection A, did not result from the injured or deceased employee's disobedience to specific instructions given to the employee regarding the job condition causing his injury or death or relating to the safety standards applicable to that job condition.

¶ 57 Because the evidence against Westenburg Contractors fails to establish that it was guilty of a wilful violation, this additional statutory penalty should not have been assessed. We thus affirm the review board's reversal of this penalty, albeit for different reasons than those stated by the board.

¶ 58 ADOSH next argues that the review board erred by ordering that Westenburg Contractors be reimbursed for the transcription cost of the ICA hearing. Following the administrative law judge's decision, if a party requests review before the review board, the record of the ICA hearing "shall be transcribed at the expense of the party requesting review. The record shall be certified to be true and correct by the administrative law judge." A.R.S. § 23–423(C).

¶ 59 In this case, Westenburg Contractors had ordered and paid for a transcript of the ICA hearing in order to prepare its request for review. It obtained the approval of ADOSH's attorney to use this transcript for A.R.S. § 23–423(C) purposes. Despite this approval, Administrative Law Judge Enriquez refused to certify the transcribed record to the review board and ordered Westenburg Contractors to request and pay for an additional transcript. After Westenburg Contractors paid for the second transcript on September 25, 1995, Administrative Law Judge Enriquez certified the record to the review board.

¶ 60 The review board found the second transcript to be an unnecessary expenditure for Westenburg Contractors and ordered that Westenburg Contractors be reimbursed. The review board did not abuse its discretion by ordering the reimbursement of what appears to be an unnecessary expenditure arbitrarily imposed. The board's review authority is very broad and provides that it may "affirm, reverse, modify or supplement the decision of the administrative law judge and may make such disposition of the case as it determines to be appropriate." A.R.S. § 23–423(G).

¶ 61 ADOSH last argues that the review board erred by *sua sponte* awarding attorneys' fees to Westenburg Contractors. In fact, the review board's findings and order is devoid of any mention of attorneys' fees. Although the board clearly discussed awarding attorneys' fees, there is no indication in our record that those fees were ever actually awarded. In its answering brief, Westenburg Contractors makes a provisional request for attorneys' fees incurred at all levels in this matter as a "prevailing party." *See* A.R.S. § 12–348(A)(2). Based on our resolution of this matter, Westenburg Contractors is not the prevailing party. ADOSH has not requested attorneys' fees.

## CONCLUSION

¶ 62 For all of the foregoing reasons, we set aside the review board's findings and order in this case as noted.

EDWARD C. VOSS, Judge, and NOEL FIDEL, Judge, concur.